## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

SECURITIES AND EXCHANGE
COMMISSION,

              Plaintiff,

    v.

BOLTON SECURITIES CORPORATION
d/b/a BOLTON GLOBAL ASSET
MANAGEMENT,

              Defendant.

Case No. 4:19-cv-40143

ORAL ARGUMENT REQUESTED

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANT
BOLTON SECURITIES CORPORATION d/b/a BOLTON GLOBAL
ASSET MANAGEMENT'S MOTION TO DISMISS PLAINTIFF'S
COMPLAINT PURSUANT TO FED. R. CIV. P. 12(B)(6) AND 9(B)**

**(LEAVE TO FILE MEMORANDUM UP TO 30 PAGES GRANTED 01/15/2020)**

BOLTON SECURITIES CORPORATION
d/b/a BOLTON GLOBAL ASSET
MANAGEMENT

By its attorneys,

Jack W. Pirozzolo (BBO #564879)
Kenyon C. Hall (BBO #696836)
SIDLEY AUSTIN LLP
60 State St., 36th Floor
Boston, MA 02109
Tel. (617) 223-0300
jpirozzolo@sidley.com
kenyon.hall@sidley.com

# TABLE OF CONTENTS

**PAGE**

I.      PRELIMINARY STATEMENT ........................................................................................1

II.     BACKGROUND ...........................................................................................................3

    A.     12b-1 Fees ..........................................................................................................3

    B.     Relevant Factual Allegations ...........................................................................7

       1.     BSC and BGC ......................................................................................7

       2.     Mutual Fund Share Classes and BSC's Receipt of 12b-1 Fees ..................................8

       3.     BSC's Disclosures Relevant to Actual or Potential 12b-1 Fee Conflicts of Interest ...9

       4.     BSC's Trading Activity .......................................................................10

       5.     BSC's Wells Submission .....................................................................11

III.    ARGUMENT ............................................................................................................12

    A.     Relevant Rule 12(b)(6) Legal Standard .......................................................12

    B.     Claim One: The Complaint Fails to Allege a Violation of Section 206(2)..................13

       1.     Relevant Legal Standard for Disclosure Under Section 206(2)................................13

       2.     Under the Relevant Legal Standard the SEC's Omissions Theories Fail.................15

          a.    BSC adequately disclosed the affiliation between BSC and BGC and any associated conflicts. ...................................................................................15

          b.    BSC adequately disclosed its receipt of 12b-1 fees and any associated conflicts. ....17

          c.    The SEC has not alleged adequately that BSC acted negligently. ...........................21

          d.    The SEC's Section 206(2) claim is not pled with the particularity required pursuant to Fed. R. Civ. P. 9(b). ...........................................................................22

    C.     Claim Two: The Complaint Fails to Show That Section 206(3) of the Advisers Act is Applicable......................................................................................................24

D.     Claim Three: BSC Maintained Policies and Procedures Reasonably Designed to Prevent Compliance Violations ....................................................................26

E.     The Court Should Disregard the Complaint's Wells Submission Allegations..............27

F.     The SEC Cannot Seek Disgorgement ..........................................................................28

G.     Conduct Predating November 4, 2014 Is Time-Barred ...............................................29

IV.     CONCLUSION ...........................................................................................................29

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) ....................................................................................................12

*Basic Inc. v. Levinson,*
    485 U.S. 224 (1988) ....................................................................................................14

*Beddall v. State St. Bank & Tr. Co.,*
    137 F.3d 12 (1st Cir. 1998) ...........................................................................................2

*Benzon v. Morgan Stanley Distrib., Inc.,*
    420 F.3d 598 (6th Cir. 2005) .......................................................................................14

*In re Computervision Corp. Sec. Litig.,*
    869 F. Supp. 56 (D. Mass. 1994) ...........................................................................15, 22

*Glassman v. Computervision Corp.,*
    90 F.3d 617 (1st Cir. 1996) ..........................................................................................13

*Greebel v. FTP Software, Inc.,*
    194 F.3d 185 (1st Cir. 1999) ........................................................................................23

*Hinck v. U.S.,*
    550 U.S. 501 (2007) ....................................................................................................29

*Innocent v. HarborOne Bank,*
    319 F. Supp. 3d 571 (D. Mass. 2018) .........................................................................12

*Kokesh v. SEC,*
    137 S. Ct. 1635 (2017) ................................................................................................29

*Liu v. SEC, cert. granted* No. 18-1501, 2019 WL 5659111 (U.S. Nov. 1, 2019) ......................29

*Lucia v. Prospect St. High Income Portfolio, Inc.,*
    769 F. Supp. 410 (D. Mass. 1991) ...............................................................................23

*Morris v. Wachovia Sec., Inc.,*
    277 F. Supp. 2d 622 (E.D. Va. 2003) .....................................................................13, 22

*O'Brien v. DiGrazia,*
    544 F.2d 543 (1st Cir. 1976) ........................................................................................14

*Robare Grp., Ltd. v. SEC,*
    922 F.3d 468 (D.C. Cir. 2019) .....................................................................................21

*Rogan v. Menino*,
    175 F.3d 75 (1st Cir. 1999)..................................................................................13

*SEC v. Bolla*,
    401 F. Supp. 2d 43 (D.D.C. 2005) ....................................................................14

*SEC v. Capital Gains Research Bureau, Inc.*,
    375 U.S. 180 (1963) ............................................................................................13

*SEC v. First City Financial Corp.*,
    890 F.2d 1215 (D.C. Cir. 1989) .........................................................................28

*SEC v. Moran*,
    944 F. Supp. 286 (S.D.N.Y. 1996).....................................................................22

*SEC v. Nutmeg Grp., LLC*,
    162 F. Supp. 3d 754 (N.D. Ill. 2016)..................................................................21

*SEC v. Tambone*,
    550 F.3d 106 (1st Cir. 2008)...............................................................................22

*SEC v. Westport Capital Mkts. LLC*,
    408 F. Supp. 3d 93 (D. Conn. 2019) ..................................................................21

*SEC v. Yun*,
    148 F. Supp. 2d 1287 (M.D. Fla. 2001) .............................................................28

*Skillman v. Suffolk Jewelers & Pawnbrokers*,
    No. 10-11407-PBS, 2010 WL 5099365 (D. Mass. Dec. 7, 2010) .........................13

*Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*,
    444 U.S. 11 (1979) ............................................................................................13

*TSC Indus., Inc. v. Northway, Inc.*,
    426 U.S. 438 (1976) ...........................................................................................14

*Wallerstein v. Primerica Corp.*,
    701 F. Supp. 393 (E.D.N.Y. 1988).....................................................................17

*Watterson v. Page*,
    987 F.2d 1 (1st Cir. 1993).....................................................................................2

## Federal Statutes

15 U.S.C.A. § 80a-2(9) ...................................................................................................25

15 U.S.C.A. § 80b-2(a)(12) ............................................................................................24

15 U.S.C.A. § 80b-6(2) ...................................................................................... 2, 13, 22

15 U.S.C.A. § 80b-6(3) ........................................................................................ 2, 3, 24

15. U.S.C.A. § 80b-6(4) .....................................................................................................3

28 U.S.C.A. § 2462 .........................................................................................................29

## Rules

Fed. R. Civ. P. 9(b) .......................................................................... 2, 22, 23, 29

Fed R. Civ. P. 12(b)(6) .................................................................... 2, 12, 23, 29

## Regulations

17 C.F.R. § 202.5(c) .......................................................................................................11

17 C.F.R. § 240.15l-1 .......................................................................................................4

17 C.F.R. § 270.12b-1 ................................................................................................1, 3

17 C.F.R. § 275.206(4)-7 ...........................................................................................3, 26

## Other Authorities

*In the Matter of Alison, LLC*, Exch. Act Rel. No. 80355 (Mar. 29, 2017) ...................................18

Amendments to Form ADV, Inv. Adv. Act Rel. No. 3060 (Oct. 12, 2010) ..................................6

Announcement, Share Class Selection Disclosure Initiative, SEC (Feb. 12, 2018),
    https://www.sec.gov/enforce/announcement/scsd-initiative ................................................5, 6

Bearing of Distribution Expenses by Mutual Funds: Advance Notice of Proposed
    Rulemaking, Inv. Co. Act Rel. No. 10252 (May 23, 1978) ...................................................3

Bearing of Distribution Expenses by Mutual Funds,
    Inv. Co. Act Rel. No. 11414 (Oct. 28, 1980) .........................................................................3

*In the Matter of David A. Finnerty et al.*, SEC Admin. Proceeding File No. 3-
    11893 (June 1, 2009) ...........................................................................................................5

Definition of Terms in and Specific Exemptions for Banks, 66 Fed. Reg. 27,760 .....................18

Form ADV and Investment Advisers Act Rules,
Inv. Adv. Act Rel. No. 4509 (Aug. 25, 2016) ........................................................6

*Frequently Asked Questions Regarding Disclosure of Certain Financial Conflicts
Related to Investment Adviser Compensation*, SEC (Oct. 18, 2019),
https://www.sec.gov/investment/faq-disclosure-conflicts-investment-adviser-
compensation ..........................................................................................................20

Guide to Broker-Dealer Registration, SEC Division of Trading and Markets, April
2008 ........................................................................................................................18

Hearings on S. 3580 Before the Subcomm. of the Comm. on Banking and
Currency, 76th Cong., 3d Sess. 320 (1940) ...........................................................26

Hester Peirce, Commissioner, SEC, Reasonableness Pants (May 8, 2019),
https://www.sec.gov/news/speech/speech-peirce-050819 ....................................6, 7

Jay Clayton, Chairman, SEC, Statement Regarding SEC Staff Views (Sept. 13,
2018), https://www.sec.gov/news/public-statement/statement-clayton-091318 ......4

*In the Matter of Manarin Inv. Counsel, Ltd.*,
Inv. Act Rel. No. 3686 (Oct. 2, 2013) ......................................................................5

Mutual Fund Distribution Fees; Confirmations (proposed Jul. 21, 2010) (to be
codified at 17 C.F.R. pt. 210).................................................................................18

*National Exam Program Risk Alert: OICE's 2016 Share Class Initiative*,
SEC OCIE (July 13, 2016), https://www.sec.gov/files/ocie-risk-alert-2016-
share-class-initiative.pdf ..........................................................................................4

PART 2: Uniform Requirements for the Investment Adviser *Brochure* and
*Brochure Supplements*: General Instructions for Part 2 of Form ADV,
https://www.sec.gov/about/forms/formadv-part2.pdf ................................. 5, 16, 18

*In the Matter of Pekin Singer Strauss Asset Mgmt. Inc.*,
Inv. Adv. Act Rel. No. 4126 (June 23, 2015) ...........................................................5

Procedures Relating to the Commencement of Enforcement Proceedings and
Termination of Staff Investigations, Sec. Act Rel. No. 5310 (Sept. 27, 1972) ......28

Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 3 (2010).................21

Rules Implementing Amendments to Investment Advisers Act of 1940,
Inv. Adv. Act Rel. No. 3221 (Sept. 19, 2011) ..........................................................6

Securities Confirmations, Exch. Act. Rel. No. 15219 (Oct. 6, 1978).........................26

Securities Confirmations, Exch. Act. Rel. No. 15220 (Oct. 6, 1978).........................25

**Articles**

Paul Atkins, *Reg BI Footnote Justifies Pausing SEC Share Class Disclosure Initiative*, THINKADVISOR (July 19, 2019, 9:59 AM), https://www.thinkadvisor.com/2019/07/19/reg-bi-footnote-justifies-pausing-sec-share-class-disclosure-initiative/ ....................................................................................7

Peter Wallison and Paul Atkins, *Yet Another Festering Regulatory Problem Growing in Washington*, THE HILL (Aug. 16, 2019, 2:00 PM), https://thehill.com/opinion/finance/457678-yet-another-festering-regulatory-problem-growing-in-washington ...........................................................................7

Stephen M. Cutler et al., *SEC Wells Submissions: A New Caution Required?*, SIMPSON THACHER REGULATORY AND ENFORCEMENT ALERT (Nov. 13, 2019), http://www.stblaw.com/docs/default-source/Publications/regulatoryenforcementalert_11_13_19.pdf ...........................................11

## I.      PRELIMINARY STATEMENT

This matter relates to a controversial 2018 Securities and Exchange Commission ("SEC" or the "Commission") Enforcement initiative known as the Share Class Selection Disclosure Initiative (the "SCSD Initiative" or the "Initiative"). The Initiative concerns a certain type of mutual fund marketing and distribution fee authorized pursuant to 17 C.F.R. § 270.12b-1 (2020) ("Rule 12b-1 fees" or "12b-1 fees"). Rule 12b-1 fees, also commonly referred to as "trail" fees, are usually remitted to the broker who sells the mutual fund shares to the investor. Because mutual funds often have multiple share classes, some of which do not carry 12b-1 fees, the possibility exists that an investor might be able to purchase shares without those fees. Although this feature of 12b-1 fees has been well known to the SEC since they were first authorized in 1980, at no time in the nearly forty years of the existence of such fees had the SEC promulgated a rule or provided any formal guidance requiring an investment adviser to make specific disclosures about the existence of non-12b-1 fee-paying share classes prior to the launch of the Initiative. Regardless, the SEC announced through the Initiative that it would accuse investment advisers of violations of securities laws if they had not disclosed mutual fund share class options in a manner that suited the SEC Enforcement staff. Such rulemaking by enforcement has received criticism from various constituencies, including a current SEC Commissioner.

It is against this backdrop that the SEC has sued Bolton Securities Corporation d/b/a Bolton Global Asset Management ("BSC") for alleged violations of the Investment Advisers Act of 1940 (the "Advisers Act"). Although the complaint filed by the SEC (the "Complaint") contains three claims for relief, the principal claim in the Complaint alleges that BSC's 12b-1 fee-related disclosures were insufficient in violation of Section 206(2) of the Advisers Act. *See* ¶¶ 30; 47–48;

*see also* 15 U.S.C.A. § 80b-6(2) (Westlaw through Pub. L. No. 116-91).[1] In making this claim, the SEC does not, because it cannot, allege that BSC failed to make disclosures regarding 12b-1 fees. Instead, the SEC relies on a theory of material omission. At base, the SEC's theory appears to be that BSC acted negligently because its disclosure language from 2014 through 2017 did not square with the view of such disclosures articulated in the 2018 Initiative. The relevant question for purposes of liability under the Advisers Act, however, is not whether the SEC Enforcement staff likes BSC's language. It is whether BSC's disclosures, when taken as a whole and objectively assessed, adequately informed investors about the existence of Rule 12b-1 fees and the potential conflict of interest advisers had in recommending 12b-1 fee-paying share classes.

In this regard, the Complaint falls well short of what is required to state a claim under either Rule 12(b)(6) or Rule 9(b) of the Federal Rules of Civil Procedure. The Complaint does not cite to *any* rule or guidance prohibiting the disclosure language BSC used. Nor does the Complaint even attempt to address BSC's disclosures as a whole. Instead, the Complaint cherry-picks snippets of BSC's disclosures while inexplicably ignoring directly relevant and material language appearing elsewhere in the same documents. Such cherry-picking renders the Complaint fatally deficient under the controlling legal standards.

The SEC's other two claims fare no better. First, the SEC alleges that BSC engaged in improper principal trading in violation of Section 206(3) of the Advisers Act through the account of an affiliated entity, Bolton Global Capital ("BGC"). *See* ¶¶ 35; 50–51; *see also* 15 U.S.C.A. §

---

[1] All citations herein to "¶ __" refer to numbered paragraphs within the Complaint. All citations to "Ex. __" refer to exhibits attached to the Declaration of Kenyon Colli Hall, which is being filed contemporaneously with this motion. In assessing a motion to dismiss, the Court may consider documents that are incorporated by reference into the Complaint. *See Beddall v. State St. Bank & Tr. Co.*, 137 F.3d 12, 17 (1st Cir. 1998). The Court may also consider "matters of public record" without converting a Rule 12(b)(6) motion to dismiss into a motion for summary judgment. *See Watterson v. Page*, 987 F.2d 1, 3–4 (1st Cir. 1993) (citations omitted).

80b-6(3) (Westlaw through Pub. L. No. 116-91). The Complaint fails to allege with any specificity, however, facts supporting its conclusory allegations that BSC's disclosures regarding BGC were in any way inadequate; that BSC or BGC engaged in self-dealing; and/or that BSC and BGC were under common control. Second, the SEC alleges that BSC's policies and procedures were inadequate in violation of Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder. *See* ¶¶ 38–39; 54–56; *see also* 15 U.S.C.A. § 80b-6(4) (Westlaw through Pub. L. No. 116-91); 17 C.F.R. §275.206(4)-7 (2020). This claim, however, is derivative of the first two claims and fails for many of the same reasons.

Finally, the SEC has also made entirely inappropriate allegations in the Complaint that BSC is somehow culpable because it contested the SEC's theories in a written submission (known as a "Wells submission"). ¶¶ 40–42. Apparently, the SEC is asking this Court to penalize BSC for defending itself. Not only are such allegations grossly unfair to BSC, but they run afoul of relevant case law and seriously undermine the animating policy behind the Wells submission rule.

## II.    BACKGROUND

### A.    12b-1 Fees

Rule 12b-1 authorizes a mutual fund to charge so-called "12b-1 fees" to cover the costs of distribution (marketing and selling mutual fund shares) and sometimes to cover the costs of providing shareholder services. *See* 17 C.F.R. § 270.12b-1 (2020); ¶¶ 18–19. Rule 12b-1, which went into effect in 1980, reflected the SEC's policy determination that allowing mutual funds to pay such fees, often called "trail fees," out of fund assets could be beneficial for investors.[2] For

---

[2] *See* Bearing of Distribution Expenses by Mutual Funds: Advance Notice of Proposed Rulemaking, Inv. Co. Act Rel. No. 10252 (May 23, 1978) ("This action is being taken so the Commission can explore whether the use of mutual fund assets to pay distribution expenses could benefit fund shareholders under some circumstances . . ."); *see also* Bearing of Distribution Expenses by Mutual Funds, Inv. Co. Act Rel. No. 11414 (Oct. 28, 1980) (adopting Rule 12b-1).

over 30 years after the implementation of Rule 12b-1, the SEC did not issue any rule or guidance or bring any enforcement actions to suggest that investment advisers were required to explicitly disclose, *inter alia*, the availability of share classes that did not carry 12b-1 fees and/or the receipt of 12b-1 fees. This was for good reason: as the SEC itself has recognized as recently as last summer, cost is just one of many important factors and "should never be the only consideration" when recommending an investment. Regulation Best Interest: The Broker-Dealer Standard of Conduct, SEC Rel. No. 34-86031 (Sept. 10, 2019) (codified at 17 C.F.R. § 240.15l-1 (2020)).

The first time the SEC staff began to articulate the position it now appears to assert with respect to the disclosure of share class selection and related receipt of fees was July 2016. At that time, the SEC's Office of Compliance Inspections and Examinations ("OCIE") published a risk alert titled "OCIE's 2016 Share Class Initiative."[3] The July 2016 Risk Alert stated, among other things, that the SEC staff would likely be reviewing advisers' "practices surrounding [their] selection of mutual fund . . . investments in [their] clients' accounts with a focus on assessing . . . disclosures regarding compensation for the sale of shares and the conflicts of interest created." *Id.* The July 2016 Risk Alert did not prescribe the language that such disclosures should contain, nor did it make any explicit reference to 12b-1 fees. *Id.* It also did not state that an investment adviser may have related disclosure obligations in circumstances where the investment adviser did not select the mutual fund shares at issue.

---

[3] *See National Exam Program Risk Alert: OCIE's 2016 Share Class Initiative*, SEC OCIE (July 13, 2016), https://www.sec.gov/files/ocie-risk-alert-2016-share-class-initiative.pdf ("July 2016 Risk Alert"). OCIE alerts are not binding and do not constitute the views of the SEC. *See* Jay Clayton, Chairman, SEC, Statement Regarding SEC Staff Views (Sept. 13, 2018), https://www.sec.gov/news/public-statement/statement-clayton-091318 ("The Commission's longstanding position is that all staff statements are nonbinding and create no enforceable legal rights or obligations of the Commission or other parties").

Following the July 2016 Risk Alert, neither the SEC nor its staff provided any further guidance on this subject until, on February 12, 2018, the SEC's Division of Enforcement announced the Initiative.[4] The Initiative encouraged investment advisers to "self-report . . . possible securities law violations relating to their failure to make necessary disclosures concerning mutual fund share class selection" in exchange for "favorable" settlement terms. *Id.* The Initiative represented a significant shift in the SEC's articulated position with respect to disclosures regarding share class selection and the receipt of 12b-1 fees in two principal ways.

First and foremost, the Initiative marked the first time since the inception of Rule 12b-1 – nearly 40 years prior – in which the SEC asserted that firms may run afoul of the Advisers Act if their disclosures did not "explicitly disclose . . . the conflict of interest associated with the 12b-1 fees the firm, its affiliates, or its supervised persons received for investing advisory clients in a fund's 12b-1 fee paying share class when a lower-cost share class was available for the same fund." *Id.* The SEC did not – because it could not – cite to any regulations, published guidance or case law as precedent. The SEC cited only to a handful of settlement orders, none of which have any precedential value and all but two of which were released in 2017.[5] In fact, to this day, the instructions to Parts 2A and 2B of the Form ADV – the disclosure form upon which the SEC principally relies in bringing this case – still make no reference to share class selection and include no explicit references to 12b-1 fees. *See* PART 2: Uniform Requirements for the Investment

---

[4]   Announcement, Share Class Selection Disclosure Initiative, SEC (Feb. 12, 2018), https://www.sec.gov/enforce/announcement/scsd-initiative ("SCSD Initiative Announcement").

[5] *See In the Matter of David A. Finnerty et al.*, SEC Admin. Proceeding File No. 3-11893, n.3 (June 1, 2009) ("The Commission has stressed many times that settlements are not precedent") (collecting cases). Moreover, the two settled actions that preceded 2017, *In the Matter of Manarin Inv. Counsel, Ltd.*, Inv. Act Rel. No. 3686 (Oct. 2, 2013) and *In the Matter of Pekin Singer Strauss Asset Mgmt. Inc.*, Inv. Adv. Act Rel. No. 4126 (June 23, 2015), involved circumstances quite different from those at issue in this case.

Adviser *Brochure* and *Brochure Supplements*: General Instructions for Part 2 of Form ADV, https://www.sec.gov/about/forms/formadv-part2.pdf at 1, ¶ 2 ("Form 2 Instructions"). This is so notwithstanding that the SEC has amended the Form ADV multiple times in the past decade.[6]

Second, despite the SEC's stated focus on disclosures surrounding share class *selection*, the Initiative defined the population of advisers who should consider self-reporting as advisers "that received 12b-1 fees in connection with recommending, purchasing, *or holding* 12b-1 fee paying share classes for [their] advisory clients." SCSD Initiative Announcement (emphasis added).[7] The SEC cited no precedent or guidance in support of its assertion that firms *holding* 12b-1 fee-paying shares for their clients – even if they were not involved in the recommendation or purchase of such shares – could be subject to liability under the Advisers Act for failing to disclose purported conflicts of interest with respect to those shares. Indeed, no such precedent or guidance existed.[8]

The SCSD Initiative has drawn significant criticism from industry leaders and from the upper echelons of the SEC itself. Indeed, in May 2019, current SEC Commissioner Hester Peirce spoke candidly about the SCSD Initiative, stating that she "[did] not view [the SCSD] Initiative as a high point in the Commission's history" and that the SCSD Initiative suggested "that the SEC

---

[6] *See, e.g.*, Amendments to Form ADV, Inv. Adv. Act Rel. No. 3060 (Oct. 12, 2010); Rules Implementing Amendments to the Investment Advisers Act of 1940, Inv. Adv. Act Rel. No. 3221 (Sept. 19, 2011); Form ADV and Investment Advisers Act Rules, Inv. Adv. Act Rel. No. 4509 (Aug. 25, 2016).

[7] The majority of the mutual fund assets held by BSC during the period at issue in this action were purchased at other firms and later transferred over or otherwise purchased outside of the period. *See* Ex. J at 9. Because the Complaint refers to and relies on the content of BSC's Wells submission in an effort to support its claims, *see* ¶¶ 40–42, the Court may consider this document in evaluating the instant motion to dismiss. *See* footnote 1.

[8] The SEC relied instead on the same few settlement orders referenced above, most of which were not released until 2017 and none of which have precedential value. *See* footnote 5.

ha[d] fallen down on its job as a regulator." Hester Peirce, Commissioner, SEC, *Reasonableness Pants* (May 8, 2019), https://www.sec.gov/news/speech/speech-peirce-050819. Commissioner Peirce further stated:

> [W]hen we see a widespread problem that is affecting investors, we – the Commission – should issue our own guidance or promulgate a rule and put an end to the problem before it hurts investors further. Doing this is better for investors than waiting many years to bring a large enforcement initiative. **It is also respectful of the due process of the firms we regulate by giving them notice of what the SEC expects from them. . . . Sadly, that is not what happened here.**

*Id.* (emphasis added).[9] It is against this backdrop of regulatory uncertainty and untested legal theories that the SEC initiated the instant action.

### B. Relevant Factual Allegations

#### 1. BSC and BGC

BSC is a dually registered broker-dealer and investment adviser. ¶ 7. Ms. Mary Grenier holds an indirect ownership interest in BSC. ¶ 15. BSC operates a retail advisory business under the name Bolton Global Asset Management ("BGAM"). ¶ 10. As a registered investment adviser, BSC updates its SEC-mandated disclosure documents, known as Forms ADV, at least annually. ¶ 28. Such Form ADV disclosures are both filed with the SEC and offered to current and prospective advisory clients. *Id.*

---

[9] Former Commissioner Paul Atkins has also been highly critical of the SCSD Initiative. *See* Paul Atkins, *Reg BI Footnote Justifies Pausing SEC Share Class Disclosure Initiative*, THINKADVISOR (July 19, 2019, 9:59 AM), https://www.thinkadvisor.com/2019/07/19/reg-bi-footnote-justifies-pausing-sec-share-class-disclosure-initiative/ ("Alarmingly, in neither announcing the Initiative nor the subsequent settlements did the SEC cite violations of any particular rule or regulation as support for its view of the sufficiency of the disclosure[s]"); *see also* Peter Wallison and Paul Atkins, *Yet Another Festering Regulatory Problem Growing in Washington*, THE HILL (Aug. 16, 2019, 2:00 PM), https://thehill.com/opinion/finance/457678-yet-another-festering-regulatory-problem-growing-in-washington (stating that the SEC skirted the notice and comment rulemaking process, opting instead to "adopt a new interpretation with little notice, and then charge violations for activity that occurred prior to that interpretation").

Clients who open advisory accounts with BSC generally pay an advisory fee for assets under management pursuant to an investment advisory agreement with BGAM. ¶¶ 11, 28. Prior to or concurrent with the account opening process, clients receive certain disclosures from BSC, including BSC's Forms ADV. ¶ 28. BSC also monitors client accounts and representatives' receipt of selling compensation. ¶ 38. These practices are consistent with BSC's Code of Ethics, which requires that BSC's representatives "avoid activity that creates a conflict of interest." *Id.*

Bolton Global Capital ("BGC"), formerly known as Delta Equity Services Corporation, is a separate registered broker-dealer but not a registered investment adviser. ¶ 8. Mr. Raymond Grenier holds a majority ownership interest in BGC. ¶ 15. Since at least 2014, BSC's disclosures have identified BGC as an "affiliated broker-dealer." *E.g.*, ¶ 8; Ex. A at 6–7. In light of this affiliation, representatives may be dually registered as (1) an investment adviser representative ("IAR") and broker-dealer registered representative with BSC and (2) a broker-dealer registered representative with BGC. ¶ 14.

### 2. Mutual Fund Share Classes and BSC's Receipt of 12b-1 Fees

In connection with its advisory business, BSC purchases and/or holds mutual fund shares for its clients' accounts, including shares that charge 12b-1 fees. ¶ 21. Any 12b-1 fees received by BGC are shared with dually-registered representatives in their capacity as brokers on a client account and as part of their normal compensation structure. ¶¶ 14, 23. Some mutual funds offer share classes that do not carry 12b-1 fees. ¶ 20. Eligibility to own such non-12b-1 fee-paying shares is typically dictated by terms and requirements set forth in a mutual fund's prospectus. *Id.* While certain of the mutual fund investments from which BSC advisers received 12b-1 fees had non-12b-1 fee-paying share classes available, some of these non-12b-1 fee-paying share classes had minimum investment amounts. ¶ 24.

### 3. BSC's Disclosures Relevant to Actual or Potential 12b-1 Fee Conflicts of Interest

At all times relevant to this action, BSC's Form ADV Part 2A has disclosed that BSC receives fees charged by mutual fund companies; that a portion of such fees are distributed to its adviser agents; and that such arrangement presents a potential conflict of interest. *E.g.*, ¶ 30; Ex. A at 6.[10] BSC has continued to augment these disclosures over time. *See* Ex. H. As such, BSC's Form ADV Part 2A has contained additional disclosure language explicitly referencing 12b-1 fees since March 2017. ¶ 32; Ex. E at 8. In its Complaint, the SEC alleges that, during the period from August 2014 through the end of 2017, two aspects of BSC's 12b-1 fee disclosures were insufficient: (1) BSC's disclosures regarding its affiliation with BGC; and (2) BSC's disclosures regarding different mutual fund share classes, some of which pay 12b-1 fees and some of which do not. ¶ 30.

In making these allegations, however, the SEC quotes in its Complaint only portions of the relevant disclosures.[11] Since at least 2014, BSC's Form ADV Part 2A has disclosed the affiliation between BSC and BGC and the fact that some dually-registered representatives may receive selling compensation for certain transactions as a result of this arrangement. *See, e.g.*, Ex. A at 6–8. BSC has also disclosed that "**[t]his arrangement presents a conflict of interest** and may give the investment adviser representative incentive to recommend investment products based on the compensation received, rather than the client's needs." *E.g.*, Ex. A at 6. (emphasis added).

---

[10] Although not entirely clear from the Complaint, the relevant time period appears to be August 2014 through "the end of 2017." *See, e.g.,* ¶¶ 25, 28, 30.

[11] A chart mapping changes to the relevant disclosure language during the years 2014 through 2017 is being filed herewith as an exhibit to the Declaration of Kenyon Colli Hall. *See* Ex. H.

In addition, as early as 2014, BSC specifically disclosed the receipt and distribution of "trail[]" fees from mutual funds to its representatives, as well as the associated potential conflict of interest, in its Form ADV Part 2A. *E.g.*, ¶ 30; Ex. A at 6. BSC's Form ADV Part 2A also stated that mutual funds charge internal management fees, which are disclosed in a fund's prospectus and are "exclusive of and in addition to" BSC's fees. *E.g.*, Ex. A at 5. In 2017, Bolton made an additional, specific disclosure in its Form ADV Part 2A explaining 12b-1 fees and disclosing Bolton's receipt of such fees. *See* ¶ 32; Ex. E at 8; Ex. F at 7–8 (stating, *inter alia*, that, depending on the size of the position, share classes "can be available to the investor which have lower overall expenses because they do not pay 12(b)1 fees.")

### 4.    BSC's Trading Activity

The SEC separately alleges that BSC engaged in principal trading without making required disclosures to clients or obtaining client consent in violation of Section 206(3) of the Advisers Act. *See, e.g.*, ¶ 35. Specifically, the SEC alleges that BSC engaged in principal trading in violation of Section 206(3) "when it used the principal trading account of [BGC], a broker-dealer under common control with [BSC], to engage in self-dealing transactions." *Id.*[12]

Within the investment advisory agreement provided to new and prospective clients, advisory clients are offered the option to open a brokerage account with BGC, the affiliated broker-dealer. ¶¶ 12, 28. As discussed above, the affiliation between BSC and BGC has been disclosed since at least 2014. During the relevant time period, BSC's Forms ADV Part 2A also contained disclosure language specifically addressing principal trading. *See, e.g.*, Ex. A at 8–9 ("BGAM generally does not affect any principal or agency cross securities transactions for client accounts.

---

[12] The SEC does not clearly articulate what it contends to be the relevant time period for this allegation; however, it appears to be late 2014 through March 2019. ¶¶ 35, 39.

BGAM also does not generally cross trades between client accounts. Any such trade is treated as an exception and receives particular scrutiny and pre-approval."). BSC does not have its own proprietary trading accounts and holds no securities in inventory overnight as a business practice. Ex. J at 20. BGC, the broker-dealer, did engage in certain *riskless* principal transactions in which it simultaneously purchased shares to fill a customer order and sold those shares to the customer in satisfaction of the order; however, such transactions are distinct from principal trading activity. *Id.* at 10–12.[13]

### 5.    BSC's Wells Submission

Prior to filing the Complaint in this matter, the SEC staff informed BSC that it intended to recommend an enforcement proceeding and invited BSC to provide a written submission to the SEC staff (known as a "Wells submission"). ¶ 40. The Wells submission process, which has been in place for approximately 50 years, provides an opportunity for persons under investigation to "submit a written statement to the Commission setting forth their interests and position in regard to the subject matter of the investigation." 17 C.F.R. § 202.5(c) (2020). The animating purpose of the Wells process is to provide "the robust advocacy and legal and factual argumentation that are so critical to ensuring fairness in an enforcement."[14] In accordance with that process, BSC, much as it has done here in this proceeding, set forth its disagreement with the staff's legal position,

---

[13] This distinction is supported by the fact that FINRA, which regularly examines BGC's net capital computation, never suggested that BGC's riskless principal transactions should subject BGC to the higher net capital required for principal trades. Ex. J at 11–12. A regulatory opinion regarding net capital received by BGC (then known as Delta Equity Services Corporation) in 2011 and appended to BSC's Wells submission also opined that BGC "is not engaged in trading for its own account or proprietary trading" and that BGC did not need to increase its net capital to the higher net capital amount required for principal trades. *Id.* at 12, 36–37.

[14] Stephen M. Cutler et al., *SEC Wells Submissions: A New Caution Required?*, SIMPSON THACHER REGULATORY AND ENFORCEMENT ALERT (Nov. 13, 2019), http://www.stblaw.com/docs/default-source/Publications/regulatoryenforcementalert_11_13_19.pdf.

arguing that BSC's disclosures comply with the Advisers Act. The SEC now alleges that BSC's Wells submission is itself a basis for the SEC's current claim because BSC "failed to acknowledge the wrongfulness of [BSC's] conduct" in that submission. ¶¶ 40–42.

## III.   ARGUMENT

The SEC asserts three claims for relief based on purported violations of the Advisers Act dating as far back as August 2014. First, the SEC alleges that BSC violated Section 206(2) of the Advisers Act by failing to disclose material conflicts of interest with respect to its receipt of 12b-1 fees. *See* ¶¶ 2; 47–48. Second, the SEC alleges that BSC violated Section 206(3) of the Advisers Act by "engaging in fixed income trades through the principal trading account of an affiliated broker-dealer that was under common control" without obtaining consent from its advisory clients. *See* ¶¶ 2; 50–51. Third, the SEC alleges that BSC violated Section 206(4) of the Advisers Act and Rule 206(4)-7 thereunder by failing to adopt and implement written policies and procedures reasonably designed to prevent the above-referenced purported violations of Sections 206(2) and 206(3) of the Advisers Act. *See* ¶¶ 2; 54–56. The SEC also seeks disgorgement in its request for relief. For the reasons that follow, the Court should dismiss all three claims and the SEC's request for disgorgement. The Court should also dismiss all claims and/or requests for relief pertaining to any conduct prior to November 4, 2014.

### A.   Relevant Rule 12(b)(6) Legal Standard

Under Rule 12(b)(6) dismissal is appropriate if the Complaint, taking all allegations as true, fails to state a claim upon which relief can be granted. In applying this standard, "where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," dismissal is appropriate. *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Accordingly, "[t]he relevant inquiry focuses on the reasonableness of the inference of liability that the plaintiff is asking the court to draw from the facts alleged in the complaint." *Innocent v. HarborOne Bank*, 319 F. Supp.

3d 571, 573 (D. Mass. 2018) (Hillman, J.) (citation omitted). The Court need not credit "bald assertions, unsupportable conclusions, periphrastic circumlocutions, and the like." *Rogan v. Menino*, 175 F.3d 75, 77 (1st Cir. 1999) (citation omitted); *see also Glassman v. Computervision Corp.*, 90 F.3d 617, 628 (1st Cir. 1996). If a complaint contains general allegations "that [] encompass a wide swath of conduct, much of it innocent," then the plaintiff has not stated a plausible claim. *Skillman v. Suffolk Jewelers & Pawnbrokers*, No. 10-11407-PBS, 2010 WL 5099365, at *4 n.4 (D. Mass. Dec. 7, 2010) (citation omitted).

**B.      Claim One: The Complaint Fails to Allege a Violation of Section 206(2)**

**1.      Relevant Legal Standard for Disclosure Under Section 206(2)**

Section 206(2) of the Advisers Act renders it unlawful for any investment adviser to "engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client." 15 U.S.C.A. § 80b-6(2) (Westlaw through Pub. L. No. 116-91).[15] In order to state a cognizable claim for relief under Section 206(2) of the Advisers Act, the SEC must establish, *inter alia*, that the defendant made a misstatement or omission of material fact to a client or prospective client and did so negligently. *See Morris v. Wachovia Sec., Inc.*, 277 F. Supp. 2d 622, 644 (E.D. Va. 2003) (citations omitted).

The SEC does not allege that BSC made any false statements in its disclosures to clients and/or prospective clients. The SEC also does not, because it cannot, allege that BSC failed to

---

[15] Section 206 is interpreted as imposing a fiduciary duty on investment advisers to disclose material facts to their clients. *See Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 17 (1979) ("§ 206 establishes 'federal fiduciary standards' to govern the conduct of investment advisers" (internal citation omitted)); *see also SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191–92 (1963) (discussing congressional intent behind Advisers Act).

make conflict of interest disclosures.[16] Rather, the SEC's claim rests entirely on an allegation that BSC's disclosures were insufficient because they allegedly omitted material facts. Yet in order to overcome a motion to dismiss on such a theory, the SEC must identify the allegedly omitted fact and establish its materiality. In this context, a fact is material only if the SEC can show "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) (setting forth general materiality standard); *see also SEC v. Bolla*, 401 F. Supp. 2d 43, 66 (D.D.C. 2005) (applying the *TSC Indus.* materiality standard to a Section 206(2) claim). In articulating this standard, the Supreme Court "was careful not to set too low a standard of materiality; it was concerned that a minimal standard might bring an overabundance of information within its reach . . . a result that is hardly conducive to informed decisionmaking." *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988) (citing *TSC Indus.*, 96 S. Ct. at 2132) (internal quotations omitted).

When applied to mutual fund share class disclosures, courts have found that disclosures are sufficient where they "put prospective investors on notice . . . such that investors could pursue that line of inquiry with their financial advisors if they were concerned." *Benzon v. Morgan Stanley Distrib., Inc.*, 420 F.3d 598, 612 (6th Cir. 2005) (affirming dismissal of claims arising from allegations that defendants failed to disclose material facts regarding the selection of certain share classes and regarding brokers' incentives for selling such shares). Advisers' disclosures need not – indeed, should not – overwhelm current or prospective investors with detail. So long as the disclosures, when viewed in totality and in context, provide an investor with "sufficiently specific

---

[16] The absence of such allegations has legal significance in the First Circuit. "[W]hen a complaint omits facts that, if they existed, would clearly dominate the case, it seems fair to assume that those facts do not exist." *O'Brien v. DiGrazia*, 544 F.2d 543, 546 n.3 (1st Cir. 1976).

facts" to enable them to ask further questions of their investment advisor about potential conflicts of interest, the disclosures are adequate as a matter of law. *Cf. In re Computervision Corp. Sec. Litig.*, 869 F. Supp. 56, 60–63 (D. Mass. 1994) (stating that the central inquiry in determining whether disclosures are materially misleading is "whether defendants' representations, *taken together and in context*, would have [misled] a reasonable investor") (citation omitted) (emphasis in original)).

### 2. Under the Relevant Legal Standard the SEC's Omissions Theories Fail

Essentially, the Complaint alleges that BSC "fail[ed] to disclose material conflicts of interest" in its disclosures in two related – but distinct – respects. ¶ 2. First, the SEC asserts that from August 2014 to the end of 2017, BSC's Form ADV Part 2A "failed to disclose" BSC's own conflicts of interest in light of the relationship between BSC and BGC. ¶ 30. Second, the Complaint alleges that during the period from August 2014 to the end of 2017, BSC omitted material facts from its disclosures regarding its receipt of 12b-1 fees and any related conflicts of interest. ¶ 31. Neither of the SEC's theories has merit.

### a. BSC adequately disclosed the affiliation between BSC and BGC and any associated conflicts.

The Complaint makes much of the "substantial[] overlap" between BSC, the investment adviser, and BGC, its affiliated broker dealer. ¶ 13. The SEC alleges that BGC's acceptance of 12b-1 fees attributable to mutual fund shares held at BGC and under advisory management by BSC resulted in BGC paying some of this compensation to investment adviser representatives (in their capacity as registered brokers) who were registered with both BGC and BSC and that "Bolton Securities, distinct from its IARs, had a direct financial conflict of interest because its affiliate, Bolton Global Capital, also received and retained a portion of the 12b-1 fees." ¶¶ 23; 30.

In support of its allegation that BSC's Forms ADV contained insufficient disclosures in this respect, the SEC excerpts a single sentence from BSC's Form ADV Part 2A. ¶ 30. However, this quote represents only a fragment of the paragraph from which it was excerpted. It also ignores the immediately preceding sentence, which states unequivocally that the arrangement presents a conflict of interest. The relevant disclosure language is set forth in the table below:

| Disclosure Language Cited by SEC Complaint ¶ 30 | Full Text of Relevant Disclosure, Ex. A |
|---|---|
| A portion of fees charged by mutual fund companies (trails) are distributed to adviser agents and therefore also represent a potential conflict of interest. | Certain investment adviser representatives of BGAM are also registered representatives of Bolton Global Capital ("Bolton"), an affiliated broker-dealer. These BGAM investment representatives may receive selling compensation from such broker-dealer for the facilitation of certain securities transactions on Client's behalf through Bolton. The selling compensation received by the investment representative does not constitute a significant portion of compensation received from advisory clients. **This arrangement presents a conflict of interest and may give the investment adviser representative incentive to recommend investment products based on the compensation received, rather than the client's needs.** A portion of fees charged by mutual fund companies (trails) are distributed to adviser agents and therefore also represent a potential conflict of interest. BGAM monitors the receipt of selling compensation by its representatives to identify potential conflicts of interest. |

Ex. A at 6 (emphasis added). Substantially identical versions of the above-referenced disclosure were included in every version of BSC's Forms ADV Part 2A during the period from 2014 to 2017. ¶ 30; *see generally* Ex. H.

The SEC appears to take issue with the precise language of BSC's disclosures, but the SEC's disagreement over precise language does not provide the basis for a claim. As discussed above, no specific language for such disclosures is required under either SEC guidance or the law. *See* Form 2 Instructions (disclosures "designed to promote effective communication" and written

16

"in plain English, taking into consideration [the] clients' level of financial sophistication" are adequate). Because BSC's disclosures with respect to the relationship between BSC and BGC explicitly reference a "conflict of interest" in the arrangement, they easily satisfy the legal criteria.

Indeed, it is difficult to imagine language that could more plainly put the investor on notice of the conflicts of interest resulting from the affiliation between BSC and BGC. Taken together, the above-referenced disclosures in BSC's Forms ADV make clear (1) that BSC and BGC are affiliated; (2) that some investment adviser representatives are registered with *both* entities; (3) that investment adviser representatives may thus receive selling compensation from BGC for the facilitation of certain securities transactions; and (4) that the arrangement itself constitutes a conflict of interest and may give investment adviser representatives incentive to recommend investment products based on the compensation they will receive rather than the client's needs. Nothing more is required. That the SEC, in its subjective view, may have liked the disclosure to be worded differently does not render the disclosure insufficient. *Cf. Wallerstein v. Primerica Corp.*, 701 F. Supp. 393, 397 (E.D.N.Y. 1988) (rejecting plaintiffs' motion to enjoin a corporation's proposed merger, finding that the corporation's disclosures were not false or misleading and noting that "[r]easonable latitude in [how disclosures are made] is important if nit-picking is not to become the name of the game" (citation omitted)).

          **b.**     **BSC adequately disclosed its receipt of 12b-1 fees and any associated conflicts.**

For the same reasons, the SEC's claim that BSC's disclosures regarding its receipt of 12b-1 fees were deficient fails. BSC has provided adequate disclosure of its receipt of 12b-1 fees and any related conflicts of interest.[17] In fact, the SEC concedes that at least as far back as 2014, BSC's

---

[17] In addition to BSC's own disclosures, clients also receive a mutual fund prospectus with each purchase. Such prospectuses contain information about all applicable share classes and about any 12b-1 fees. Ex. J at 13, n.5.

Form ADV Part 2A included a disclosure stating that a "portion of fees charged by mutual fund companies (trails)" were distributed to adviser agents and represented a potential conflict of interest. ¶ 30. While the SEC now asserts that the language of this disclosure was inadequate, BSC is aware of no precedent or disclosure language requirements in support of the SEC's position that existed before the Initiative.

Indeed, the SEC has treated the term "trails" as interchangeable with "12b-1 fees" for decades. In final and proposed rules dating as far back as 2001, the SEC has stated that 12b-1 fees are often described as trail commissions, finding the basis for its definition of the term in industry rules.[18] To this day, the Form ADV itself makes no reference to 12b-1 fees but *does* require disclosure of compensation "including distribution or service ('trail') fees from the sale of mutual funds." Form 2 Instructions, at Item 4.A.2. In light of the SEC's own repeated use of the terms "trails" and "12b-1 fees" interchangeably, the SEC cannot now allege that BSC omitted a material fact from its disclosures and/or violated federal securities laws by doing the same.

The SEC further admits that BSC expanded its disclosures over time, adding a disclosure specifically referring to 12b-1 fees in March 2017. ¶ 32. The revised disclosure explicitly stated that BSC receives 12b-1 fees and that they are collected "in addition to commissions, and other fees and expenses disclosed in a fund's prospectus fee table." *Id*. The Complaint alleges that this disclosure, too, was insufficient, asserting that BSC "failed to disclose that its receipt of this compensation represented a conflict of interest." ¶ 33. This allegation is wholly unsupported by

---

[18] *See, e.g.,* Definition of Terms in and Specific Exemptions for Banks, 66 Fed. Reg. 27,760; Mutual Fund Distribution Fees; Confirmations (proposed Jul. 21, 2010) (to be codified at 17 C.F.R. pt. 210); Guide to Broker-Dealer Registration, SEC Division of Trading and Markets, April 2008 (noting that 12b-1 fees are considered an example of trailing commissions (or "trail(s)") received by brokers); *In the Matter of Alison, LLC*, Exch. Act Rel. No. 80355 (Mar. 29, 2017) ("12b-1 fees are known in the securities industry as trailers and service fees").

the disclosures on which the SEC relies. As reflected in the table below, the 12b-1 disclosure language added to BSC's Form ADV Part 2A in 2017 was included *in addition to*, and not in lieu of, all of the above-referenced disclosures regarding the receipt of trail fees and regarding the conflicts of interest presented by the relationship between BSC and BGC.

| Disclosure Language Cited by SEC Complaint ¶ 32 | Full Text of Relevant March 2017 Disclosures, Ex. E |
|---|---|
| With regards to mutual fund products, Bolton receives 12(b) fees and other rebates from mutual fund companies, directly or through [a third-party service provider], for servicing assets held in client accounts. These fees and rebates are in addition to commissions, and other fees and expenses disclosed in a fund's prospectus fee table. | Mutual funds and exchange traded funds also charge internal management fees, which are disclosed in a fund's prospectus.  Such charges, fees and commissions are exclusive of and in addition to BGAM's fees. . . .<br><br>Certain investment adviser representatives of BGAM are also registered representatives of Bolton Global Capital ("Bolton"), an affiliated broker-dealer. These BGAM investment representatives can, in certain instances, receive selling compensation from such broker-dealer for the facilitation of certain securities transactions on Client's behalf through Bolton. The selling compensation received by the investment representative does not constitute a significant portion of compensation received from advisory clients. **This arrangement presents a conflict of interest and can give the investment adviser representative incentive to recommend investment products based on the compensation received, rather than the client's needs.**<br>**A portion of fees charged by mutual fund companies (trails) are distributed to adviser agents and therefore also represent a potential conflict of interest.**<br>BGAM monitors the receipt of selling compensation by its representatives to identify potential conflicts of interest. . . .<br><br>BGAM is affiliated with Bolton Global Capital ("Bolton"), a FINRA member broker-dealer. The majority of BGAM's principals and investment adviser representatives are also associated with Bolton Global. **As affiliates, BGAM and Bolton Global offer investment programs in which Bolton Global provides certain services such as brokerage, custodial and execution services as introducing broker-dealer. This relationship can create a conflict of interest to clients because BGAM's investment adviser representatives who are also associated with Bolton Global receive selling compensation.** BGAM monitors the receipt of selling compensation to identify and mitigate potential conflicts of interest. . . . |

|  | Through its brokers and investment advisor representatives, Bolton Global Capital and Bolton Securities (dba Bolton Global Asset Management) (Bolton) offers a broad array of investment products and services to its customers. Companies for some of the products and services we sell or recommend participate in activities that may help facilitate the distribution of their products by making our brokers and advisors, we believe, more knowledgeable about those companies' products and services, such as marketing activities and educational programs (including, but not limited to, attendance for a fee, by company representatives at Bolton conferences, marketing, and due diligence presentations to our advisors). With regards to mutual fund products, Bolton receives 12(b) fees and other rebates from mutual fund companies, directly or through Pershing LLC, for servicing assets held in client accounts. These fees and rebates are in addition to commissions, and other fees and expenses disclosed in a fund's prospectus fee table. |
|---|---|

*See* Ex. E (emphasis added). The Complaint does not provide any support for its assertion that these disclosures, as a whole, were somehow deficient.

Critically, the SEC's allegations with respect to BSC's disclosures regarding the receipt of 12b-1 fees do not differentiate between instances where BSC *held* mutual fund shares that charged 12b-1 fees (i.e., those recommended and/or sold by another financial services provider and transferred into a BSC advisory account) and instances where BSC *purchased* 12b-1 fee-carrying mutual fund shares for its clients. The Defendant is aware of no precedent or guidance in support of the position the SEC now appears to have adopted that the act of holding 12b-1 fee-paying shares for clients – even if the investment adviser was not involved in the recommendation or purchase of such shares – could result in liability under the Advisers Act. Indeed, the SEC did not publish any guidance on this subject until October 18, 2019, less than one month prior to the initiation of the instant action and nearly two years *after* the period during which the SEC alleges that BSC's disclosures were deficient.[19]

---

[19] *See Frequently Asked Questions Regarding Disclosure of Certain Financial Conflicts Related to Investment Adviser Compensation*, SEC (Oct. 18, 2019), https://www.sec.gov/investment/faq-

### c. The SEC has not alleged adequately that BSC acted negligently.

Section 206(2) does not impose a strict liability standard on advisers. In order to state a cognizable claim under Section 206(2) of the Advisers Act, the SEC must also show that BSC acted at least negligently. In this context, courts have adopted the definition of negligence set forth in the Restatement (Third) of Torts: a person acts negligently if the person does not "exercise reasonable care under all the circumstances." *See Robare Grp., Ltd. v. SEC*, 922 F.3d 468, 477 (D.C. Cir. 2019) (adopting standard set forth in Restatement (Third) of Torts: Liability for Physical & Emotional Harm § 3 (2010)).

Recent case law reflects that parties are typically found to have acted negligently in violation of Section 206(2) in instances where the party failed to include *any* disclosure about the subject matter at issue. For example, the District Court for the District of Connecticut recently granted the SEC's motion for summary judgment with respect to a claim under Section 206(2) of the Advisers Act (and found the defendant investment adviser's disclosures inadequate as a matter of law) where the investment adviser's disclosures referred only generally to the receipt of "commissions" and its Form ADV "did not disclose its receipt of 12b-1 fees in response to a specific query on . . . the Form ADV asking whether [defendant] . . . received 'distribution or service ('trail') fees from the sale of mutual funds.'" *SEC v. Westport Capital Mkts. LLC*, 408 F. Supp. 3d 93, 102 (D. Conn. 2019); *see also Robare*, 922 F.3d at 477 (denying petitioners' appeal of a finding that they had violated Section 206(2) of the Advisers Act and noting that for several years, petitioners' Form ADV made "no mention" of a payment arrangement between Robare Group and Fidelity); *SEC v. Nutmeg Grp., LLC*, 162 F. Supp. 3d 754, 779–80 (N.D. Ill. 2016)

---

disclosure-conflicts-investment-adviser-compensation (the "FAQs") (investment advisers should "consider [] disclosure obligations with respect to both recommendations to purchase and recommendations to continue holding an investment").

(finding that defendants violated Section 206(2) by failing to disclose asset transfers, certain payments made to third parties and commingling of client funds); *SEC v. Moran*, 944 F. Supp. 286, 294 (S.D.N.Y. 1996) (defendant found liable for violating provisions of the Advisers Act including Sections 206(2) and 206(4) where Forms ADV and BD wholly omitted the fact that defendant's sons were directors of his firms). In stark contrast, as set forth at length above, BSC provided fulsome, tailored disclosures about its business structure, its practices and any related conflicts of interest. The Complaint thus fails to allege facts supporting the inference that BSC acted negligently.

<div align="center">

**d.      The SEC's Section 206(2) claim is not pled with the particularity required pursuant to Fed. R. Civ. P. 9(b).**

</div>

While violation of Section 206(2) of the Advisers Act is not a scienter-based offense, the plain text of the statute reflects that it proscribes conduct which operates as a "fraud or deceit" upon any client or prospective client. 15 U.S.C.A. § 80b-6(2) (Westlaw through Pub. L. No. 116-91). As such, the heightened pleading standard set forth in Rule 9(b) of the Federal Rules of Civil Procedure applies. *See Morris*, 277 F. Supp. 2d at 645 (finding that "it is not clear that Rule 9(b) applies . . . because the claim arises under § 206(2)", but conducting a Rule 9(b) analysis regardless); *cf. SEC v. Tambone*, 550 F.3d 106, 149 (1st Cir. 2008) (applying Rule 9(b) standard to charges, including pursuant to Section 206(2) of the Advisers Act), *reh'g en banc granted, opinion withdrawn on other grounds*, 573 F.3d 54 (1st Cir. 2009) and *opinion reinstated in part on reh'g*, 597 F.3d 436 (1st Cir. 2010); *In re Computervision Corp. Sec. Litig.*, 869 F. Supp. at 63 (collecting cases applying Rule 9(b) standard to claims involving alleged untrue statements of fact or omissions of material facts where the complaint "sounds in fraud").

Rule 9(b) of the Federal Rules of Civil Procedure states that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." The First

Circuit has been "notably strict and rigorous in applying the Rule 9(b) standard in securities fraud actions." *Greebel v. FTP Software, Inc.*, 194 F.3d 185, 193 (1st Cir. 1999) (collecting cases). Historically, the First Circuit has required that fraud plaintiffs specify each allegedly misleading statement or omission and "explain why the challenged statement or omission is misleading by requiring that the complaint . . . provide some factual support for the allegations of fraud." *Id.* (citation omitted) (internal quotation marks omitted).

The SEC has failed to do so. As discussed above, the SEC relies in the Complaint only on handpicked fragments from BSC's Forms ADV and does not address the majority of BSC's disclosure language. In fact, notwithstanding the SEC's claim that BSC's disclosures were deficient through "the end of 2017," the Complaint makes *no* mention of the disclosure language regarding share class selection and 12b-1 fees added to BSC's Form ADV Part 2A in September 2017, let alone explain why such language would be considered deficient. *See* Ex. F. at 6–7.

With respect to each of BSC's disclosures during the period August 2014 through the end of 2017, the Complaint does not explain why the alleged omissions are misleading, particularly when taken together and in context with the disclosure language not referenced in the Complaint. Rather, the Complaint simply states that BSC "knew or should have known" that its disclosures were insufficient, *see, e.g.,* ¶¶ 24, 29, 31, 33, 37, without providing any basis for that assertion as is required pursuant to Rule 9(b). *See Lucia v. Prospect St. High Income Portfolio, Inc.*, 769 F. Supp. 410, 419 (D. Mass. 1991) (finding Rule 9(b) deficiencies where plaintiffs did not give a sufficient factual basis to support their conclusion that defendants knew or should have known their prospectus was misleading), *aff'd*, 36 F.3d 170, 174 (1st Cir. 1994). Accordingly, even if the Court were to find that the Complaint clears the Rule 12(b)(6) hurdle, the Court should nevertheless dismiss the claim pursuant to Rule 9(b).

C.     **Claim Two: The Complaint Fails to Show That Section 206(3) of the Advisers Act is Applicable**

Section 206(3) of the Advisers Act states that it is unlawful for any investment adviser, directly or indirectly, "acting as principal for his own account, knowingly to sell any security to or purchase any security from a client . . . without disclosing to such client in writing before the completion of such transaction the capacity in which he is acting and obtaining the consent of the client to such transaction." 15 U.S.C.A. § 80b-6(3) (Westlaw through Pub. L. No. 116-91). In this context, in order for the Complaint to state a claim, it must allege sufficient facts to show that BGC was a broker-dealer under "common control" with BSC. *See, e.g.*, ¶¶ 1, 2, 13, 17, 35.[20] The Advisers Act defines "control" as "the power to exercise a controlling influence over the management or policies of a company, unless such power is solely the result of an official position within such company." 15 U.S.C.A. § 80b-2(a)(12) (Westlaw through Pub. L. No. 116-91). The Complaint, however, does not allege facts sufficient to meet this definition.

The SEC appears to allege that BSC and BGC are under common control because certain individuals are dually employed by BSC and BGC. *See* ¶¶ 14–15. Such dual employment is plainly insufficient to establish common control under the Advisers Act. Any power that dual employees (including executives and dually-registered representatives) have over the management or policies of BSC and/or BGC is solely the result of their official positions. As set forth above, the Advisers Act excludes such a circumstance from the definition of "control."

Significantly, the Complaint sets forth no allegations that any "control" exists beyond individuals' "official positions." The SEC does include an allegation suggesting that BSC and BGC are under common control because Mary Grenier (the beneficial owner of BSC) and

---

[20] The SEC does not clearly articulate what it contends to be the relevant time period for this allegation; however, it appears to be late 2014 through March 2019. ¶¶ 35, 39.

Raymond Grenier (who holds a majority ownership interest in BGC) are married. ¶ 15. But marital status, absent anything more, does not equate to common control. The Investment Company Act of 1940 is instructive for this aspect of the SEC's claim. It states in relevant part:

> Any person who owns beneficially, either directly or through one or more controlled companies, more than 25 per centum of the voting securities of a company shall be presumed to control such a company. Any person who does not so own more than 25 per centum of the voting securities of any company shall be presumed *not* to control such company.

15 U.S.C.A. § 80a-2(9) (Westlaw through Pub. L. No. 116-91) (emphasis added). Public records reflect that Ms. Grenier is the only individual with more than 25% (indirect) ownership of BSC (and Mr. Grenier is not) while Mr. Grenier is the only individual with more than 25% ownership of BGC (and Ms. Grenier is not). *See* Bolton Securities Corporation, BROKERCHECK BY FINRA, https://brokercheck.finra.org/firm/summary/129376; *see also* Bolton Global Capital, BROKERCHECK BY FINRA, https://brokercheck.finra.org/firm/summary/15650. The mere fact that Mr. and Ms. Grenier are married is not sufficient to overcome the presumption that each controls, at most, only *one* of the two firms.[21]

The Complaint also fails to provide any support for its assertion that BSC engaged in principal trading activity, much less so for its claim that "Bolton Securities . . . used the principal trading account of Bolton Global Capital . . . to engage in self-dealing transactions." ¶ 35. This portion of the Complaint appears to refer to certain riskless principal trading transactions facilitated by BSC.[22] BSC does not have its own proprietary trading accounts and holds no securities in

---

[21] Nor does the fact that both BSC and BGC receive administrative support from a third entity, Bolton Capital Group, Inc., suggest that this entity in any way controls either firm. *See* ¶ 16. As the SEC concedes, Bolton Capital Group is a management services company that is not registered with the Commission as a financial services provider in any capacity. *See* ¶ 9.

[22] The SEC has long acknowledged the distinction between traditional principal trading and riskless principal transactions. *See*, *e.g.*, Securities Confirmations, Exch. Act. Rel. No. 15220 (Oct. 6, 1978) (defining "riskless" principal transactions as instances in which "having received an order

inventory overnight. Ex. J at 20. The transactions to which the Complaint appears to refer involve the simultaneous purchase of shares to fill a customer order and sale of those shares in satisfaction of the customer order. Such riskless principal trading activity is simply not the conduct targeted by Section 206(3). As the legislative history of Section 206(3) reflects, the passage of this provision was intended to prevent self-dealing by investment advisers. *See* Hearings on S. 3580 Before the Subcomm. of the Comm. on Banking and Currency, 76th Cong., 3d Sess. 320 (1940) (statement of David Schenker, Chief Counsel, SEC Investment Trust Study) ("I think it is the Commission's recommendation that all self-dealing between the investment counselor and the client should be stopped"). Further, while the SEC has settled a number of cases involving alleged violations of Section 206(3) of the Advisers Act, including in connection with riskless principal trading, the Defendant is aware of no case law imposing liability under Section 206(3) solely in connection with riskless principal trading. Because the SEC has failed to adequately allege that BSC engaged in conduct falling within the purview of Section 206(3) of the Advisers Act, this claim must fail.

### D.    Claim Three: BSC Maintained Policies and Procedures Reasonably Designed to Prevent Compliance Violations

In addition to the claims discussed above, the Complaint alleges that BSC violated Rule 206(4)-7 under Section 206(4) of the Advisers Act by failing to maintain sufficient written policies and procedures. *See* ¶¶ 2; 54–56; *see also* 17 C.F.R. § 275.206(4)-7 (2020). The SEC alleges that BSC's written policies and procedures were deficient in two primary ways, neither of which has merit.

---

to buy from the customer, [the broker] sold the security to another person to offset a contemporaneous purchase from the customer"); Securities Confirmations, Exch. Act. Rel. No. 15219 (Oct. 6, 1978) (stating that "riskless" principal transactions "are in many respects equivalent to transactions effected on an agency basis").

First, the SEC alleges that from August 2014 through the end of March 2018, BSC did not adopt and implement policies and procedures reasonably designed to prevent the firm from violating the Advisers Act by "failing to disclose fully and fairly" conflicts of interest. *See* ¶¶ 38, 54. The SEC has articulated no cognizable grounds for this claim. Rule 206(4)-7 requires only that policies and procedures be implemented and that they be "reasonably designed" to prevent violations of the Advisers Act and the rules thereunder. The Complaint acknowledges that BSC *did* maintain a written policy requiring employees to "avoid activity that creates a conflict of interest." ¶ 38. That the policy was effective is self-evident: to the extent there were conflicts of interest arising from BSC's financial interest in 12b-1 fees and/or its use of an affiliated broker-dealer, such conflicts of interest were properly disclosed in BSC's Form ADV disclosures. *See generally* Ex. A–H.[23]

Second, the SEC alleges that BSC did not adopt and implement written policies and procedures "reasonably designed to prevent its violation of the principal trading restriction set forth in Section 206(3) of the Advisers Act." ¶ 55. This aspect of the SEC's claim, too, fails. As discussed above, the Complaint does not set forth facts sufficient to establish that the conduct alleged falls within the purview of Section 206(3) of the Advisers Act in the first instance.

**E.    The Court Should Disregard the Complaint's Wells Submission Allegations**

The Court should summarily reject the SEC's attempt to fault BSC for "fail[ing]" in its Wells submission to "acknowledge the wrongfulness" of its conduct and for "offer[ing] no

---

[23] In the same vein, the SEC alleges that Bolton did not "have any policy or procedure reasonably designed to carry out [a] review with respect to client holdings of mutual funds or share classes of mutual funds that charged [] 12b-1 fees." ¶ 38. As discussed herein, the Defendant is not aware of any precedent or guidance in support of the SEC's position that holding 12b-1 fee-paying shares for clients – even if the investment adviser was not involved in the recommendation or purchase of such shares – can result in liability under the Advisers Act, nor did the SEC publish any guidance asserting this perspective until approximately three months ago. The SEC cannot now allege that BSC is at fault for not having had policies and procedures that it was not required to maintain.

assurances" that it would amend its written policies and procedures. ¶ 41. Since its inception nearly 50 years ago, the animating purpose of the Wells process has been to "encourag[e] interested persons to make their views known to the Commission" and to allow the Commission to be informed "not only . . . of the findings made by its staff but also . . . to have before it the position of persons under investigation at the time it is asked to consider enforcement action." Procedures Relating to the Commencement of Enforcement Proceedings and Termination of Staff Investigations, Sec. Act Rel. No. 5310 (Sept. 27, 1972).

Apparently, the SEC now intends to penalize BSC for advocating its position in the very manner envisioned for the Wells process. This is grossly unfair to BSC. It is also inconsistent with the well-established rule that an entity cannot be penalized simply for exercising its right to advocate for itself. *See SEC v. First City Financial Corp.*, 890 F.2d 1215, 1229 (D.C. Cir. 1989) ("The securities laws do not require defendants to behave like Uriah Heep in order to avoid [sanctions]. They are not to be punished because they vigorously contest the government's accusations") (emphasis omitted); *SEC v. Yun*, 148 F. Supp. 2d 1287, 1294 (M.D. Fla. 2001) ("[W]here litigants do not publicly acknowledge the wrongfulness of their conduct due to a decision to contest SEC enforcement, such actions should not prejudice those litigants since a full and vigorous defense is a 'right under our system of justice'") (citation omitted).

Indeed, the SEC's allegations will have insidiously harmful effects well beyond this case. The SEC's allegations, if countenanced, will undoubtedly chill the very advocacy the Wells process was meant to encourage. It is entirely inappropriate to eviscerate the meaningful effect and intent of this process through an enforcement action penalizing a party that has followed it.

## F.    The SEC Cannot Seek Disgorgement

The Court should dismiss the SEC's request for disgorgement. (*See* Prayer for Relief, ¶ B). Congress has not expressly authorized the SEC to seek disgorgement in federal actions,

notwithstanding that it has so authorized other remedies. *See Kokesh v. SEC*, 137 S. Ct. 1635, 1640 (2017); *see also Hinck v. U.S.*, 550 U.S. 501, 506 (2007) (citing to the "well-established principle" that detailed statutory provisions typically "pre-empt[] more general remedies").[24]

### G. Conduct Predating November 4, 2014 Is Time-Barred

The statute of limitations for the claims brought by the Commission is five years. *See* 28 U.S.C.A. § 2462 (Westlaw through Pub. L. No. 116-91). Any claims or requests for relief pertaining to conduct prior to the date the SEC filed this action, November 4, 2014, are time-barred and must be dismissed.[25]

## IV.   CONCLUSION

For the reasons set forth above, the Court should dismiss the Complaint in its entirety pursuant to Rules 12(b)(6) and 9(b) of the Federal Rules of Civil Procedure.

Dated: January 17, 2020

<div style="margin-left:40%">

BOLTON SECURITIES CORPORATION d/b/a
BOLTON GLOBAL ASSET MANAGEMENT

By its attorneys,

*/s/ Jack W. Pirozzolo*
Jack W. Pirozzolo (BBO #564879)
Kenyon C. Hall (BBO #696836)
SIDLEY AUSTIN LLP
60 State St., 36th Floor
Boston, MA 02109
Tel. (617) 223-0300
jpirozzolo@sidley.com
kenyon.hall@sidley.com

</div>

---

[24] In the *Kokesh* decision, the Supreme Court did not reach the question of "whether courts possess authority to order disgorgement in SEC enforcement proceedings." *Id.* at 1642 n.3. The question of whether the SEC can seek disgorgement from a court as "equitable relief" is currently pending before the Supreme Court. *See* Brief of Petitioner, Liu v. SEC (2019) (No. 18-1501), 2019 WL 5659111, *cert. granted* No. 18-1501, 2019 WL 5659111 (U.S. Nov. 1, 2019).

[25] While BSC did sign a three-month tolling agreement with the SEC in September 2018, it was not for this captioned action. *See* Ex. K at 1.

**<u>CERTIFICATE OF SERVICE</u>**

I, Jack W. Pirozzolo, hereby certify that the foregoing document is being served upon all counsel of record via the Court's CM/ECF system.

/s/ *Jack W. Pirozzolo*
Jack W. Pirozzolo